SEALED

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED
MAR 12 2015
CLERK, U.S. DISTRICT COURT
By _____
Deputy

# United States District Court

__NORTHERN__ DISTRICT OF __TEXAS__

In the Matter of the Search of
(Name, address or Brief description of person, property or premises to be searched)

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

3518 LAKEVIEW PARKWAY
ROWLETT, TEXAS 75088

CASE NUMBER: 3:15-MJ- 152 BK

I __James Lasater__ being duly sworn depose and say:

I am a(n) __Task Force Officer with the Drug Enforcement Administration (DEA)__ and have reason to believe that on the person of or **XX** on the property or premises known as (name, description and/or location)

(SEE ATTACHMENT A).

in the __NORTHERN__ District of __TEXAS__ there is now concealed a certain person or property, namely (describe the person or property to be seized)

(SEE ATTACHMENT B).

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)
property that constitutes evidence of the commission of a crime, contraband, the fruits of crime, and is, otherwise, criminally possessed, **concerning a violation of Title __21__ United States code, Section(s) __846__**. The facts to support a finding of Probable Cause are as follows:

(SEE ATTACHED AFFIDAVIT OF DEA TASK FORCE OFFICER JAMES LASATER).

Continued on the attached sheet and made a part hereof.    XX Yes __ No

_____
Signature of Affiant
JAMES LASATER
Task Force Officer, DEA

Sworn to before me, and subscribed in my presence

__March 12, 2015__                                    at             __Dallas, Texas__
Date                                                                                City and State

**RENEE H. TOLIVER**
**United States Magistrate Judge**
Name and Title of Judicial Officer

_____
Signature of Judicial Officer

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR A SEARCH WARRANT AT: 3518 LAKEVIEW PARKWAY ROWLETT, TEXAS 75088 | **FILED UNDER SEAL**<br><br>S.W. NO. 15- |

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, James Lasater, having been duly sworn, do depose and state as follows:

### PREFACE

1. The following affidavit is furnished to support an application for a search warrant for: 3518 Lakeview Parkway, Rowlett, Texas (Location A).

2. Location A contains a retail business and is located in the City of Rowlett, County of Dallas, within the Dallas Division of the Northern District of Texas. Location A is inside a one story glass front retail outlet with the numbers "3518" over the door and the words "City Blends Fit House Café" affixed in blue lettering above the door on the building. It is situated in the Timberlake Shopping Center located at the southeast corner of Rowlett Road and Lakeview Parkway (Hwy 66) between Grammy Nails and Spa and Cici's Pizza.

### AFFIANT BACKGROUND

3. I am a Task Force Officer (TFO) with the Parker County Sheriff's Department assigned to the United States Drug Enforcement Administration (DEA)

**Affidavit in Support of Search Warrant – Page 1**

Tactical Diversion Squad since 2010. The Dallas Field Division's Tactical Diversion Squad is tasked to investigate the illicit diversion of pharmaceutical controlled substances and listed chemicals. As a DEA Task Force Officer, I am authorized to investigate crimes involving the Controlled Substances Act, 21 U.S.C. § 801 et seq. In addition to my forty-two years of law enforcement service, my training includes participation in numerous in-service schools relating to the investigation of pharmaceuticals, pharmaceutical narcotics, and narcotic trafficking, including but not limited to, the investigation of the diversion of prescription drugs and listed chemicals over the Internet. I have conducted a variety of investigations into violations of the Controlled Substances Act ranging from simple possession of narcotics to complex criminal conspiracies. In addition, I have received both formal and informal training during my tenure with the DEA in computer related technologies and cyber-crime investigation. Your Affiant is an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. §2510(7), that is, an officer of the United States authorized to conduct investigations of, or make arrests, for offenses enumerated in 18 U.S.C. 2516.

4. I make this Affidavit based upon personal knowledge derived from my participation in this investigation, evidence collected by other investigators, and my experience investigating drug-trafficking organizations. It does not set forth all of my knowledge about this case, but sufficient evidence to find probable cause to believe that the residence subject of this warrant contains evidence of drug trafficking including fruits, instrumentalities, contraband, and/or other items of evidentiary value relative to the investigation. My belief is based upon:

    a. my experience investigating illegal narcotics and related criminal activity;

    b. oral and written reports and documents regarding this investigation that I have received from members of the DEA, and local law enforcement agencies;

    c. discussions I have had personally concerning this investigation with experienced drug-trafficking investigators;

    d. physical surveillance conducted by the DEA and local law enforcement agencies, the results of which have been reported to me either directly or indirectly;

    e. review of telephone toll records, pen register data; telephone subscriber information;

    f. controlled substance purchases;

    g. information derived from a confidential source (CS1);

    h. information derived from a Source of Information (SOI1); and

    i. text and wire messages intercepted during a duly authorized Title 3 electronic intercept signed November 17, 2014, by the Honorable Sidney A. Fitzwater, District Judge, Northern District of Texas and December 22, 2014, by the Honorable Barbara M.G. Lynn, District Judge, Northern District of Texas.

## BACKGROUND ON NARCOTICS INVESTIGATIONS

5. Based on my training and experience, and participation in this investigation and other investigations involving the trafficking of narcotics, I know that:

    a. Individuals who deal in illegal controlled substances routinely conceal in their residences, vehicles, out buildings, places of operation and places of business, caches of illegal controlled substances, large amounts of currency, financial instruments,

**Affidavit in Support of Search Warrant – Page 3**

precious metals, jewelry and other items of value and/or proceeds of illegal controlled substance transactions relating to obtaining, transferring, secreting or spending large sums of money made from engaging in illegal controlled substances activities.

b. It is common for individuals who deal in illegal controlled substances to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences, out buildings, places of operation, places of business and/or motor vehicles for ready access and to conceal such items from law enforcement authorities and that such records may be maintained in paper or electronic format.

c. Individuals who deal in illegal controlled substances maintain books, records, receipts, notes, ledgers, bank records, money orders, and other papers relating to the transportation, ordering, sale, and distribution of illegal controlled substances. These individuals commonly "front" (provide illegal controlled substances on consignment) illegal controlled substances to their clients and thus maintain some type of records concerning monies owed. The aforementioned books, records, receipts, notes, ledgers, etc. are maintained where the dealer in illegal controlled substances has ready access to them including but not limited to on his/her person, in his/her motor vehicles, in his/her place of business or place of residence. These individuals commonly utilize ledger books and computer systems to maintain these records. A long-standing pattern of criminal activity can support a finding of probable cause to search for these items even if fairly long periods of time have lapsed between the criminal acts and the issuance of the warrant.

**Affidavit in Support of Search Warrant – Page 4**

d. Individuals who deal in illegal controlled substances profit from the sale of illegal controlled substances and they attempt to legitimize these profits. To accomplish these goals, these individuals utilize false and fictitious business records, foreign and domestic banks, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate shell corporations and business fronts.

e. Individuals who deal in illegal controlled substances commonly maintain addresses or telephone numbers in books or papers, which reflect names, addresses and/or telephone numbers for their associates in their illegal organization. In addition, these individuals utilize telephone systems to maintain contact with their associates in their illegal business. These telephones are often in the primary location of these individual's illegal businesses, be it residence, place of business, or motor vehicles.

f. Individuals who deal in illegal controlled substances take, or cause to be taken, photographs of themselves, their associates, their property and their illegal product. These individuals usually maintain these photographs in their possession, at their residences or places of operation, or on their mobile electronic devices such as cellular phones or other electronic storage medium.

g. Individuals who deal in illegal controlled substances usually keep paraphernalia for packaging, cutting, weighing, manufacturing and distributing of illegal controlled substances. This paraphernalia includes laboratory equipment and glassware, chemical formulas, manufacturing notes, scales, plastic bags and cutting agents.

h. Individuals who deal in illegal controlled substances or individuals that reap substantial profits from providing the raw materials and equipment utilized in illegal

**Affidavit in Support of Search Warrant – Page 5**

conduct, commonly violate federal income tax laws by attempting to conceal the true amount and source of their income from the government.

 i. Individuals who deal in the illegal distribution of controlled substances commonly utilize cellular telephones or other electronic medium in order to maintain contact with their clients and suppliers. These individuals utilize the cellular telephones and caller identification devices in an attempt to prevent Law Enforcement agents from discovering their true location at the time the illegal drug transactions are occurring. Often these individuals utilize these devices to maintain or store the telephone numbers or contacts via other electronic medium as well as other information about their co-conspirators where they will have easy access to them.

 j. Firearms are tools of the drug dealer's trade. Your Affiant has been involved in several search warrants involving illegal narcotics distributors and can state that on almost every occasion the suspects were found to be in possession of firearms. I know that these firearms are used by drug traffickers to protect their illegal enterprises.

 k. Finally, your Affiant knows that persons involved with drug trafficking often utilize hidden compartments, safes, lockboxes, or other secure storage devices within their places of business, vehicles, or elsewhere to secrete drugs, contraband, and/or money in an attempt to thwart law enforcement's ability to find these items.

## PROBABLE CAUSE

6. Based upon my training, experience, and the facts set forth herein, there is probable cause to believe that the evidence sought to be located, as fully described in Attachment B, will be located at Location A, included all storage places, safes, garages,

**Affidavit in Support of Search Warrant – Page 6**

out buildings or structures, or automobiles found or maintained on the curtilage of these suspected premises. Attachment B is hereby attached and incorporated by reference.

7. The Drug Enforcement Administration has been investigating the activities of Troy Don SUDDARTH since October 2012. SUDDARTH is the owner/franchisee of CITY BLENDS, a nutritional supplement shop located at 3518 Lakeview Parkway, in Rowlett, Texas located in Dallas County within the Northern District of Texas (Location A).

8. SUDDARTH also owned a second nutritional supplement shop called LAST ROUND NUTRITION, which was located inside the Town East Mall in Mesquite, Texas, also in Dallas County within the Northern District of Texas.

9. From this investigation, agents know that SUDDARTH is involved in a Texas-based drug-trafficking organization responsible for the manufacture, possession, and delivery of products containing methasterone and other anabolic steroids, Schedule III controlled substances, in violation of 21 U.S.C. § 846.

10. SUDDARTH and co-conspirators manufacture "nutritional supplements" in pill form and lace these supplements with methasterone and other anabolic steroids. The pills are then bottled and sold as "testosterone enhancers," often times to unsuspecting purchasers who have no idea that they are taking a controlled substance. SUDDARTH readily sells these items at Location A.

11. In October 2012, the DEA initiated this investigation based upon a Source of Information (SOI1) that worked for SUDDARTH at LAST ROUND NUTRITION.

Affidavit in Support of Search Warrant – Page 7

12. On October 1, 2012, Agents and Investigators with the Dallas Tactical Diversion Squad interviewed SOI1 at their office concerning his/her employment at LAST ROUND NUTRITION.

13. According to SOI1, SUDDARTH has products manufactured and bottled containing anabolic steroids under the names "Biotest" and "Drostanol" and sells these products as "legitimate nutritional supplements" at Location A and at LAST ROUND NUTRITION in Rowlett and Mesquite, Texas.

14. SOI1 indicated that he/she saw these things during his/her employment with SUDDARTH. SOI1 indicated that he/she was approached by an individual named "Jarrod" who also worked at LAST ROUND NUTRITION about selling particular products which contained steroids.

15. According to SOI1, "Jarrod" who was later identified by Texas Workforce Records as Jarrod RODRIGUEZ, told him he/she could earn extra commissions by pushing certain products that were manufactured by SUDDARTH and sold in his stores. SOI1 indicated that when he/she showed hesitance about becoming involved and asked additional questions, he/she was scolded by SUDDARTH and terminated because he/she "knew too much" about SUDDARTH's operations.

16. On November 8, 2012, DEA Special Agents conducted two different undercover purchases at Location A: one bottle of "Test fire" and one bottle of "Biotest" were purchased for $70 each.

17. Each bottle purchased contained 60 dosage units. Laboratory analysis was conducted on both of these products by the DEA South Central Laboratory in Dallas,

Affidavit in Support of Search Warrant – Page 8

Texas. Both products were found to contain methasterone, a Schedule III anabolic steroid. Nowhere on the bottle did the contents indicate that methasterone was present nor did the bottle possess the requisite "CIII" symbol as required by 21 USC §825(a) and (b), which make it unlawful to *[manufacture] and distribute a controlled substance in a commercial container unless such container [bears] a label containing an identifying symbol for such a substance in accordance with such regulations.*

18.  On May 15, 2013, February 18, 2014, and March 4, 2014, a DEA Special Agent reentered Location A to conduct additional purchases of products believed to contain anabolic steroids. Additional bottles labeled "Biotest" were again purchased by the agents and later were found to contain methasterone and/or dehydrochlormethyltestosterone, Schedule III controlled substances. Again, the container did not possess the requisite symbols required in 21 U.S.C. §825.

19.  On July 10, 2014, CS1 was sent into Location A for the purpose of purchasing anabolic steroids and speaking to Troy SUDDARTH concerning his operations.

20.  CS1 made contact with SUDDARTH in Location A and had a lengthy conversation during which CS1 was able to obtain the trust of SUDDARTH. This conversation was electronically recorded and monitored by agents.

21.  During the course of the conversation, SUDDARTH disclosed to CS1 that a friend named "Miguel" was responsible for manufacturing these products.

22.  SUDDARTH directed CS1 to several products on his shelf for purchase including "Dragon," "Growth Fire," and "Test Fire" and indicated that he has sold 5,000

**Affidavit in Support of Search Warrant – Page 9**

bottles of the "Dragon" in the past year ($75 per bottle). SUDDARTH described the products to CS1 and stated, "...That, that Dragon is a lot like Dbol and it's got an estrogen blocker in it. That Growth Fire is a lot like Deca....Test Fire is just basically testosterone powder."

23. Investigators know from this investigation that Troy D. SUDDARTH is in contact with an individual named Miguel ROJAS of Laredo, Texas.

24. In March 2013, subscriber and telephone records from SUDDARTH's cellular phone (214-558-8807) were obtained via subpoena to Verizon Wireless. Investigators noted that this phone was in contact with 956-220-3151, a T-Mobil Wireless phone subscribed to Miguel A. ROJAS at 102 McPherson Drive, Laredo, Texas. ROJAS is well-known to the Drug Enforcement Administration. ROJAS is the owner of two nutritional supplement companies (PURA NUTRITION) and a gymnasium (OLYMPUS MUSCLE AND FITNESS) located in Laredo, Texas. ROJAS has been identified in numerous past DEA investigations as the source of supply for clandestinely manufactured steroids. Your Affiant reviewed the files of the Drug Enforcement Administration as well as files provided to him from the Federal Bureau of Investigation and discovered the following case history concerning Miguel ROJAS and Troy SUDDARTH.

25. On October 16, 2008, local authorities around Houma, LA arrested Derek CURTISS with 40 vials of steroids and 2 gallons of GHB. In CURTISS' phone was a contact for Miguel ROJAS. In March 2009, CURTISS was re-arrested by federal authorities based on an indictment from the Eastern District of Louisiana. During the

**Affidavit in Support of Search Warrant – Page 10**

course of an interview, CURTISS indicated that he was the source of supply of clandestinely manufactured steroids for Miguel ROJAS in Laredo, TX. CURTISS reportedly purchased bulk steroid powder from China for $3500 per kilogram and supplied ROJAS in Laredo, Texas.

26. Between August 25, 2009 and August 27, 2009, Laredo DEA/FBI facilitated meetings between FBI Special Agent Scott Payne acting in an undercover capacity as a retail distributor of anabolic steroids and Brandon ODOM, an employee of ROJAS' at PURA NUTRITION. During the course of meetings, ODOM explains that ROJAS is supplying steroids to several professional body builders including Prince FONTENOT. ODOM also details a scheme whereby ROJAS is the manufacturer of OLYMPUS INDUSTRIES products and that these supplements contain ingredients other than those listed on the label. ODOM stated that ROJAS is now manufacturing a product called "DRAGON" which is supposed to give the user great gains in muscle mass. During the course of this undercover meet, ODOM supplies Agent Payne with two vials of anabolic steroids.

27. From my training and experience, I know that when SUDDARTH says that "Dragon" is a lot like Dbol it is my belief that he is saying that the active ingredient is similar to Dianabol, an anabolic steroid known by the chemical name Methandrostenolone. From training and experience I also know that when SUDDARTH characterizes "Growth Fire" as being a lot like Deca, it is my belief that he is stating that the active ingredient in that product is similar to the anabolic steroid Deca Durabolin also known by the chemical name of Nandrolone. All three products were purchased by CS1

Affidavit in Support of Search Warrant – Page 11

on July 10, 2014. The products labeled "Growth Fire" and "Test Fire" were tested by the DEA South Central Laboratory and found to contain methasterone. The product labeled "Dragon" is still pending analysis.

28. On November 17, 2014, and on December 22, 2014, United States District Judge for the Northern District of Texas Sidney Fitzwater and Barbara M.G. Lynn, signed orders authorizing the interception of wire and electronic communications for separate 30 day periods on cellular phone number 214-558-8807, a phone subscribed to Dana WOOLLEY but utilized by Troy D. SUDDARTH. Investigators initiated the intercept of December 29, 2014 and terminated the intercept on January 27, 2015 as required by the Order. During the course of the intercept, numerous calls were intercepted that indicated SUDDARTH had both knowledge that he sold certain products in Location A which contained anabolic steroids as well as the intent to distribute these items.

29. On January 10, 2015, agents intercepted a phone call between Troy D. SUDDARTH on 214-558-8807 and telephone number 214-608-8355 lasting 10 minutes and 14 seconds. Phone number 214-608-8355 is subscribed to Dana WOOLLEY but believed to be utilized by Troy SUDDARTH's father because SUDDARTH identifies the individual as "Dad." During the phone call, the caller asked if he (Troy SUDDARTH) has any kind of "growth hormone" or pills that are "kind of mild" so that you don't have to take shots. SUDDARTH replied by stating that he has a product that comes in a white bottle called "G-FACTOR" that "Miguel" makes and that it is "really a drug" but "sold as a supplement." SUDDARTH continued in the conversation by describing it as an "oral

**Affidavit in Support of Search Warrant – Page 12**

growth hormone." It should be noted that the possession and sale of growth hormone is 21 U.S.C. §333 pertaining to the possession or distribution of human growth hormone.

30. On January 25, 2015 at 12:09 p.m., SUDDARTH placed an additional call to 214-608-8355 and again spoke to an elderly male believed to be SUDDARTH's father. During the course of the phone call, SUDDARTH discussed providing both "growth hormone" and "testosterone" to the individual. SUDDARTH indicated that he is going to send "pro-hormones, testosterone pills" to the individual and identifies "Bio-Test" as "Drostanol" as such products. It should be noted that these are the very products purchased by Agents acting in an undercover capacity in SUDDARTH's store CITY BLENDS in Rowlett, Texas (Location A).

## **CONCLUSION**

31. Based upon the totality of the above described circumstances, law enforcement believes that probable cause exists to search the business known as CITY BLENDS, 3518 Lakeview Parkway, in Rowlett, Texas, County of Dallas, Northern District of Texas (Location A) for fruits, instrumentalities, contraband, and/or other items of evidentiary value believed to be contained therein and that Troy D. SUDDARTH knowingly and intentionally manufactures and/or possesses with the intent to distribute Schedule III controlled substances, to wit, anabolic steroids (i.e., methasterone), in violation of 21 U.S.C. §846.

_____
James Lasater, Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me this ___12th___ day of March, 2015

_____
HON. RENEE H. TOLIVER
United States Magistrate Judge
Northern District of Texas

**Affidavit in Support of Search Warrant – Page 14**

# ATTACHMENT A

**Place to be Searched**

**Location A = 3518 Lakeview Parkway, Rowlett, Texas**

3518 Lakeview Parkway, Rowlett, Texas is further described as a retail business is located in the City of Rowlett, County of Dallas, within the Dallas Division of the Northern District of Texas. The business is a one story glass front retail outlet with the numbers "3518" over the door and the words "City Blends Fit House Café" affixed in blue lettering above the door on the building. It is situated in the Timberlake Shopping Center located at the southeast corner of Rowlett Road and Lakeview Parkway (Hwy 66) between Grammy Nails and Spa and Cici's Pizza.




# ATTACHMENT B

**Things to be Seized**

1. All business records in paper or electronic format evidencing violations of 21 U.S.C. §846 (Conspiracy to Manufacture, Distribute, or Possess a Controlled Substance) as well as 18 U.S.C. §1956 and/or §1957 (Laundering of Monetary Instruments) pertaining to the purchase and sale of "nutritional supplements" purportedly manufactured by:

    a. Olympus, Olympus Labs, or Olympus Laboratories;

    b. Biohazard Labs or Biohazard Laboratories;

2. All "nutritional supplements" known to the Government to be adulterated and/or misbranded which may contain anabolic steroids including the products labeled as follows:

    a. Biotest

    b. Drostanol

    c. Testfire

    d. Growthfire

    e. Dragon

3. All records, paper or electronic, discussing, referencing, or related to correspondence or communications (including e-mail, text messages, instant messaging, and voice mail) between the owner, employees, or any agent or contractor representing the company and any individual concerning the purchase or sale of any of the "nutritional supplement" products listed in Section 1 of Attachment B.

4. All invoices, bills of sale, purchase, purchase agreements, contracts, or other business records relating to the purchase, distribution, acquisition, or sale of the items listed in Section 2 of Attachment B of this warrant in paper or electronic form.

5. All records, paper or electronic, constituting financial statements of the company including tax returns, bank statements, investment accounts, business filings with the State of Texas, or other financial documents relating to the company.

6. All computer hardware used to commit, further, or facilitate any violation of the offenses cited above, including any and all electronic storage devices or electronic equipment capable of collecting, analyzing, creating, displaying, converting, storing,

concealing, or transmitting electronic, magnetic, optical, or similar computer impulses or data. Included within the definition of computer hardware is any data processing hardware (such as central processing units and self-contained laptop or notebook computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical and compact disk storage devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); related communications devices (such as modems, cables and connections, recording equipment, RAM and ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone generating devices); and any devices, mechanisms, or parts that can be used to restrict access to such hardware (such as physical keys and locks).

7. For any computer hardware seized pursuant to this warrant, all records evidencing, memorializing, or identifying the individual(s) who owned, used, possessed, accessed, or controlled the hardware device at the time the events described in the affidavit above, including but not limited to any logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail contacts, communications and correspondence (including but not limited to e-mail, chat, and instant messaging), and photographs. For any computer hardware seized pursuant to this warrant, all records evidencing, memorializing, or identifying any electronic storage device or equipment that was attached or connected by any means or manner to the hardware device.

8. All computer software used to commit, further, or facilitate any violation of the offenses cited above, including any and all information, instructions, programs, or program codes, stored in the form of electronic, magnetic, optical, or other media, which is capable of being interpreted by a computer or its related components. Computer software may also include data, data fragments, or control characters integral to the operation of computer software, such as operating systems software, applications software, utility programs, compilers, interpreters, communications software, and other programming used or intended to be used to communicate with computer components.

9. All computer software designed, intended, or that can be used to delete, eliminate, encrypt, hide, or obscure any records on any computer hardware device or equipment.

10. All computer-related documentation, meaning any written, recorded, printed, or electronically-stored material that explains or illustrates the configuration or use of any seized computer hardware, software, or related items;

11. All passwords and data security devices, meaning any devices, programs, or data -- whether themselves in the nature of hardware or software -- that can be used or are designed to be used to restrict access to, or to facilitate concealment of, any computer

**Attachment B to SW Application - Page 2**

hardware, computer software, computer-related documentation, or electronic data records. Such items include, but are not limited to, data security hardware (such as encryption devices, chips, and circuit boards); passwords; data security software or information (such as test keys and encryption codes); and similar information that is required to access computer programs or data or to otherwise render programs or data into usable form.

      12. The term record, as used above, means any document, information, data, or material, including that used to facilitate interstate communications, in whatever form and by whatever means such document, information, data, or material, its drafts or modifications, may have been created or stored, including, but not limited to, any hand-made form (such as writing or marking with any implement on any surface, directly or indirectly); any photographic form (such as microfilm, microfiche, prints, slides, negative, video tapes, motion pictures or photocopies); any mechanical form (such as photographic records, printing or typing); any electrical, electronic, or magnetic form (such as tape recordings, cassettes, compact disks); or any data or information on an electronic or magnetic storage device (such as floppy diskettes, hard disks, CD-ROMs, optical disks, printer buffers, sort cards, memory calculators, electronic dialers, or electronic notebooks), as well as printouts or readouts from any magnetic storage device, including any electronic information or data, stored in any form, which has been used or prepared for use either for periodic or random backup (whether deliberate, inadvertent, or automatically or manually initiated), of any computer or computer system. The form such information might take includes, but is not limited to, floppy diskettes, fixed hard disks, removable hard disk cartridges, tapes, laser disks, CD-ROM disks, video cassettes, and other media capable of storing magnetic or optical coding.

**Attachment B to SW Application - Page 3**